# CASES

## ARGUED AND DETERMINED

### IN THE

## COURT FOR THE TRIAL OF IMPEACHMENTS

### AND THE

## CORRECTION OF ERRORS,*

### OF THE

## STATE OF NEW-YORK,

#### FEBRUARY, 1806.

---

Samuel Bebce and Augustus Diggins, William Kibbe and William Howard, *Executors of the last will and testament* of William Barlow, deceased, *against* } Appellants,

The President, Directors and Company of the bank of New-York, } Respondents.

THIS cause came before the court, on an appeal from an interlocutory order of the court of chancery.

The following are the material facts which appeared in the case: On the 15th *June*, 1800, *Joseph Eden*, in order to indemnify *John Wardell*, a broker, in the city of *New-*

ALBANY, Feb. 1806.

Bebee & others v. The Bank of New-York.

E gave a bond and warrant of attorney to W, who entered up judgment thereon against E in the supreme court. W assigned the judgment to O, to secure the payment of a debt ; O assigned it to R, who again as-

---

* By the 32d article of the constitution of the state of New-York, this court is directed to consist of the president of the senate, for the time being, and the senators, chancellor, and the judges of the supreme court, or the major part of them. When an impeachment is prosecuted against the chancellor, or either of the judges of the supreme court, the functions of the person impeached are suspended, until his acquittal. When there is an appeal from a decree in equity, the chancellor is required to inform the court of the reasons of his decree, but he has no voice in the final sentence. If the cause be brought before the court by writ of error on a question of law, on a judgment of the supreme court, the judges of the court must assign their reasons for such judgment, but have no voice in its affirmance or reversal.

ALBANY,
Feb. 1806.

Bebee & others
v.
The Bank of
New-York.

*signed it to N. E having paid the whole, or nearly the whole amount of the judgment to W, he acknowledged satisfaction. The day after the satisfaction had been acknowledged, B & B finding the judgment against E regularly satisfied, lent him a sum of money, and took a bond and warrant of attorney, on which he entered up judgment against E in the same court. N afterwards applied to the supreme court to have the satisfaction acknowledged by W, on the first judgment, vacated on the ground of fraud. The court ordered the satisfaction to be vacated, and the judgment to be restored; and*

York, against certain indorsements which he had made on the notes of *J. Eden*, and to secure the payment of monies lent to *J. Eden*, executed a bond in the penal sum of $100,000, conditioned for the payment of $50,000, with a warrant of attorney, to confess judgment thereon. On the 8th *July*, 1800, by virtue of the warrant of attorney, a judgment was entered up in the supreme court, in the name of the said *Wardell*, against *J. Eden*. In order to secure *Nathaniel Olcott*, another broker in the city of *New-York*, the payment of certain monies lent by him to *Wardell*, the latter assigned to him the judgment thus entered against *J. Eden*. In *July* and *August*, 1800, *J. Eden* paid to *Wardell* all the money due on the judgment, except about $467, which was paid the 6th *October*, 1800, and on the 10th *October*, 1800, *Wardell* acknowledged satisfaction of the judgment.

About the 24th *July*, 1800, *Wardell* and *Olcott* settled their accounts together, when the former was indebted to the latter about $25,000, for which he gave his three promissory notes, payable in 30, 60 and 90 days, which were soon after transferred by *Olcott*, and have since been paid, except the sum of $1200, due on one of them. On the 11th *October*, 1800, *Joseph Eden* and *Medcef Eden*, his brother, executed to *William Barlow*, now deceased, a bond, in the penal sum of $40,000, conditioned to pay $20,000, and a warrant of attorney to confess judgment thereon ; upon which bond, by virtue of the warrant of attorney, a judgment was entered up in the supreme court. The appellants stated, in their bill in the court below, that they were jointly interested in the judgment, and had never received any satisfaction on it ; and that the money on which the judgment of *Barlow* was founded, was loaned to *Joseph Eden*, after the satisfaction of the judgment of *Wardell* against *Eden*, had been re-

thereupon N took out a *fieri facias* on that judgment, which was levied on the estate of E. B B then filed a bill *in chancery* against N and others for relief, and to obtain restitution of the money levied on the execution, and in the hands of N. On an *appeal* from an interlocutory order of the chancellor in that cause, it was held, that E having paid W 'the amount of the first judgment before notice of the assignment, and the same having been satisfied on the record, at the time the second judgment was entered up, the latter was entitled to a priority, notwithstanding the subsequent *vacatur* of the satisfaction entered on the first ; and the money levied on the first judgment, in favour of W, was ordered to be paid to B B. On an appeal from an interlocutory order of the court of chancery, this court will give judgment on the *merits* of the cause, if the same be brought before them.

gularly acknowledged ; this money consisted, according to the testimony of *J. Eden*, of $8,000 in cash, and $12,000 in notes and checks.

The respondents, in their answer in the court below, stated, that *Olcott*, by fraud and *imposition*, induced one of the *tellers*, employed in the bank, named *Roe*, to pay certain checks drawn by *Olcott*, on their cashier, to the amount of $120,000, at a time when *Olcott* had no money, or a very trifling sum in the bank. To secure *Roe*, and to indemnify him in part, *Olcott*, on the first day of *August*, 1800, assigned over to *Roe* the bond and judgment, against *J. Eden*, which had been assigned to him by *Wardell*, on the 7th *October*, 1800. *Roe* (his transaction with *Olcott* having become known) assigned over to the respondents the same bond and judgment, and on the 9th *October*, 1800, they gave notice in writing of this assignment to *Joseph Eden*. In *October*, 1800, the respondents applied to the supreme court to vacate the satisfaction acknowledged by *Wardell* of the judgment against *J. Eden*, on the ground of fraud, having given notice of the application to *J. Eden* and his attorney. In *April* following, the supreme court ordered the satisfaction to be vacated ;*

---

* See *Wardell* v. *Eden*, *Coleman's Cases*, 137, where the facts and arguments of the counsel on this application, in *October* term, 1800, and the rule granted *de bene esse*, for vacating the satisfaction, are reported.

In *January* term, 1801, a motion was made in behalf of the bank of New-York, that the rule for vacating the satisfaction entered *de bene esse* of *October* term preceding, should be made absolute. A motion was also made by the defendant, that the judgment should be set aside, or that an issue should be awarded, to try the allegation that the bond was usurious, or at least, the truth and validity of the payments made to the plaintiff on the judgment subsequent to the assignment to *Olcott*.

In *April* term following,

KENT, J. delivered the opinion of the court on both motions. 1. With respect to the first motion, I am of opinion that the *vacatur* of satisfaction directed at the last *October* term, ought to be made *absolute*. The assignee of the judgment is to be recognised by this court as the owner, and all acts of the plaintiff subsequent to the assignment, and affecting the validity of the judgment, were fraudulent. He has no more power over the judgment than a stranger ; but until the defendant has *notice* of the assignment, all payments made by him, and all acts of the plaintiff in respect *to him*, are good. In this case, however, the satisfaction

ALBANY,
Feb. 1806.

Bebee & others
v.
The Bank of
New-York.

and, thereupon, the respondents caused a *fieri facias* to be issued on the judgment, against the estate of *J. Eden*, on which the sheriff returned, that he had levied $14,076 54 cts. and *nulla bona*, as to the residue of the debt and damages.

was acknowledged and entered *after* the time that the defendant had notice ; consequently, that act is to be considered as void in respect to him, as well as to the purchaser of the judgment. (1 *Term*, 619. 4 *Term*, 340. 1 *B* & *Puller*, 447. See also, *Andrews* v. *Beecker*, in this court, as to the rights of the assignees of a *chose in action* at law. As to his rights *in equity*, see 2 *Vernon*, 540.)

It is proper, therefore, that the satisfaction should be done away, without imposing any terms, as a condition of the *vacatur ;* because, in judgment of law, it was an act done in fraud, and against right.

2. The motion on the part of the defendant is to be considered first, in respect to the allegation of usury. If that charge is now to be investigated, yet the judgment ought certainly to stand to preserve the *lien* that it has created upon the land ; and the authorities are clear and decisive, that the proper way to try the question of usury on a judgment entered by confession is, not by setting aside the judgment, but by awarding a feigned issue. (*Barnes*, 52, 277. *Cowper*, 727. 1 *B*. & *Puller*, 270.)

But I think the court ought not to *aid* the plea of usury, under the special circumstances of this case. A *bona fide* purchaser is here the owner of the judgment ; and although a bond or note, if usurious, may be void in the hands of a *bona fide* purchaser, because the statute makes the instrument itself void ; yet, the case is varied in respect to a *judgment*, which is not within the words of the act. There are also grounds in this case, to suspect *collusion* between the plaintiff and defendant, to defeat the claims of the bank, and that this charge of usury is an afterthought. The parties carried on negociations, and effected payments from time to time, between the first assignment of the judgment and the 6th of *October*, the one *knowing* that the judgment was transferred, and, therefore, acting fraudulently, and the other, acting under circumstances that ought, at least, to put him on *inquiry ;* and finally, after direct notice to the defendant, they *concur* in having satisfaction entered to consummate their transactions ; and, after failing in their efforts, at the last *October* term, to render the satisfaction valid, they now unite in setting up this new impediment to the claims of the assignee. Under these circumstances, I think the court ought not to interfere to help this defence.

3. The next object of the application on the part of the defendant is, for an issue to try the truth and validity of the payments made by the defendant to the plaintiff ; and this will depend on the time at which the defendant is to be considered as having notice of the assignment of the judgment. The application for a feigned issue is addressed to the

One of the witnesses examined in the court below, sta-
ted, that when he gave notice of the assignment to *J. Eden*,
on the 9th *October*, 1806, in behalf of the respondents,
*Eden* observed that he had paid, during the last sixty days
preceding, $40,000 to *Wardell* on account of the judg-
ment; that he knew of the assignment to *Olcott* at the
time it was made, and supposed it was intended for secu-
rity only; but *Eden*, on being examined as a witness, de-
nied that he had received any notice of the assignment.

sound discretion of the court. These issues appear from the cases
which I have examined, (1 *Wilson*, 331. *Sayer*, 253. *Barnes*, 130. *Cow-
per*, 727.) to have been granted only for the information of the court, or
where the party is otherwise without relief. In the present case the
party has a regular and competent remedy, as a *matter of right*, and
without a special interference of the court. This is by the writ of *audi-
ta querela*, which lies where some matter of discharge has arisen to the
defendant subsequent to the judgment. It is true that, in many cases,
where the defendant might be entitled to his writ of *audita querela*, the
court will relieve, in a summary way, *on motion;* but, as Lord *Holt* ob-
served, if the ground of the application be a release, or other *matter of
fact*, it is reasonable to put the party to his *audita querela*, because the
plaintiff may deny it; and if he does deny it, the court will not relieve
on motion." (1 *Lord Raym.* 439, 445. 1 *Salk.* 264.)

In the present case, the time of the notice, and, consequently, the va-
lidity, as well as the truth of the payment, is *contested* between the par-
ties, and it is proper that these points should be tried in the ordinary
and established mode for the trial of facts.

It is in the power of the court to arrest execution upon the judgment,
until the same be revived by *scire facias*, or by action of debt, when the
defendant would have an opportunity of pleading the payments. But I
see no good reason why the court should *act* at all in this, more than in
any other case, as long as the party has the power to act for himself, and
the law has supplied him with the adequate means of obtaining relief,
without the special interposition of the court. I am, therefore, of opi-
nion, that the motion on the part of the assignees of the plaintiff, that
the *vacatur* of the satisfaction should be made absolute, be granted, and
that the effect of the motion, on the part of the defendant, be denied.

*Per tot. curiam.* Rule made absolute.

---

* In *Lister* v. *Mundell*, 1 *Bos.* & *Puller*, 428. Chief Justice *Eyre* says it
is the practice to interpose in a summary way, *in all cases* where the
party would be entitled to relief, by *audita querela*. This is, no doubt,
true, if it be *ascertained* that the party *is entitled* to relief.

ALBANY,
Feb. 1806.

Bebee & others
v.
The Bank of
New-York.

In *June*, 1801, *Bebee* and *Barlow* filed their bill.— *Olcott*, who had become a bankrupt, and his assignees, were made defendants to the bill, and answered *separately*; but after filing their answers, they did not, by themselves, or otherwise, appear or join in any of the subsequent proceedings of the cause on the part of the respondents. *Barlow* afterwards died, and the names of his executors were, by an order of the court, inserted in the bill in his stead.

In *May*, 1803, the cause was brought to a hearing before his honour the chancellor, who, in *August* following, directed a trial of feigned issues by a special jury, to determine, whether *Joseph Eden* had notice of the assignment of the judgment against him, before the 7th *October*, 1800, and what payments were made by him, when, and to whom, on such judgment previous to his receiving such notice. On the 5th *July*, 1804, the issues were tried, and the jury, by their verdict, found that *Joseph Eden* had no notice of the assignment of the judgment against him, on or before the 7th *October*, 1800, but that he received notice thereof on the 9th *October*, 1800, and that he had paid *Wardell* $50,000 on such judgment, previous to his receiving notice of such assignment. At the trial of the cause, the respondents offered *Olcott* as a witness, but he was objected to by the counsel for the complainants, 1. Because he was a defendant in the suit in chancery, and no measures had been taken to have his name struck out of the bill, or for his examination as a witness, saving all just exceptions. 2. Because, though discharged as a bankrupt, he was interested in the cause, as his evidence would tend to increase his estate : 3. That he had been guilty of fraud in assigning absolutely a judgment, which he had received as a mere collateral security, and would be, therefore, liable for costs. The second objection was removed by a release from the witness to his assignees of all his right to any surplus in his estate ; but, on the first and third grounds he was rejected by the

judge before whom the issues were tried. In *March*, 1804, the *postea* having been returned and filed, a motion was made by the counsel for the respondents, for a new trial, of the issues, in order to let in the evidence of *Olcott*, who, they contended, ought not to have been excluded. After hearing the arguments of counsel on both sides, his honour the chancellor *ordered*, " that a new trial be had between the present appellants and respondents, to try the several issues therein directed ; that in such trial the present respondents, be made plaintiffs, and the present appellants, defendants, and that the several payments (if any) made on the judgment before the notice thereof, be indorsed upon the *postea* with the verdict ; and that upon the trial, *Nathaniel Olcott*, one of the defendants, be admitted to be sworn as a witness, notwithstanding his being a party in the cause, saving other just exceptions if any there should be; and if his testimony be rejected upon the said trial, the causes of rejecting the same, are also to be indorsed on the *postea*."

From this *order* the complainants below appealed to this court. The reasons for the order were assigned by

*The Chancellor.* A motion was made on the part of the defendants for a new trial.

It was admitted that *Olcott*, having become a bankrupt, offered to release, at the trial, all his rights to his surplus estate.

The judge who presided at the trial, certified that he was satisfied with the verdict.

The rejection of *Olcott* as a witness was on the technical ground of his being a party—it was a legal consequence of his situation as such, and the certificate of the judge had no bearing on this point, as the correctness of the verdict, on the evidence admitted, is not questioned.

An important object of the issues had been defeated by this rejection, as the testimony which was intended to be referred to the jury on the relative credibility of the witnesses privy to the transactions respecting the judgment,

had not been brought into view. This was evidently owing to the mistake or inattention of the defendants; and the reason of his rejection, though a valid one at the trial of the issues, must by me be considered as merely formal. To conclude, the parties on it in a case, circumstanced as this is, would be very rigid, as no interest or sinister intent can be imagined to induce the parties to risk the consequence of a rejection.

The issues, even in their original form, could not have affected the interests of *Olcott*, for the points referred to the jury expressly related to the payments made to *Wardell*, and the fraud imputed to *Olcott* could not, in any point in which I have viewed the subject, influence the verdict of the jury.

I was, therefore, of opinion that these considerations ought to prevail in favour of a new trial, unless the defendants had lost their right of applying for one by their *laches.*

The trial was in *June* ; the complainants had the verdict in their power and retained it. As soon as they applied to have the effect of it, they were followed by this motion ; this must be governed by the practice which prevails in the supreme court. If the party in possession of the verdict does not take the usual rule on the *postea*, the opposite party may, any time before he enters the rule, move in arrest of judgment, or for a new trial, though, otherwise, he is strictly held to the four days.

An order was, accordingly, made for a new trial, but upon payment of costs.

The counsel on both sides then entered into a very wide field of argument on the merits of the case, which is here contracted into as narrow compass as possible.

*Baldwin*, for the appellants. 1. The appellants, after finding that the judgment to *Wardell* had been satisfied, and the satisfaction acknowledged and regularly entered on record by the person in whose favour it was given, and who had the legal controul over it, lent their money to

*Eden* on the security of a judgment, and in full faith and confidence, that his estate, as a, peared from the records was unincumbered by any prior judgment. They are, therefore, to be regarded as *bona fide* purchasers, or incumbrancers, for a valuable consideration, without notice of any fraud, and ought not, in equity, to be postponed, by the restoration of the former judgment at the instance of a secret assignee. Though *Eden* was called on to show cause before the supreme court why the satisfaction should not be vacated, the appellants had no notice of the application. The propriety of the decision of that court, in ordering the satisfaction to be vacated, under a view of the facts then before them, is not questioned. But they did not, nor could they have intended to decide, that a fair, innocent, intervening judgment creditor, without any knowledge of the fraud, should be deprived of his security, and that unheard, or without being called upon to defend his rights. The respondents were secret assignees, and must have known that the assignor had a legal controul over the judgment, and ought to have given some public notice of the assignment, or have entered it upon record. The appellants, therefore, as innocent purchasers without notice, stand on higher and better ground. than the respondents, who have neglected to give notice, and have a prior and superior right to satisfaction of their judgment.*

2. If *Eden* did actually pay off the judgment given in favour of *Wardell*, previous to notice of any assignment, it will be admitted on all hands, that the appellants ought to prevail.† How is the fact? *Wardell* and *Eden* both swear that *Eden* did pay off the judgment before *Olcott* assigned it; and their evidence is strongly corroborated by the fact of *Eden's* making payments to *Wardell*, which he would not have done, had he known of the assignment. This evidence stands uncontradicted, except by the imperfect and inaccurate recollection of one witness. [He then went into an examination of the testimony of the

* 2 *Vernon*, 599. *Wilker* v. *Bodington.* 2 *Vernon*, 751. *Bothomley* v. *Fairfax. Ambler,* 313. *Mertins* v. *Joliff*, 2. *Fonb. on Equity*, 307. 308. 309.

† 2 *Vernon*, 693. 765. 1 *Vesey*, jun. 249. 4 *Vesey*, jun 118. 128. 389. 1 *Equity Cases Ab.* 44. § 4. 2 *Equity Cases, Ab.* 87. § 7. and note.

ALBANY,
Feb. 1806.

Bebee & others
v.
The Bank of
New-York.

witnesses on both sides, to show that there was, in reality, no contradiction, and that the evidence of *Wardell* and *Eden*, as to the payment of the judgment, and the want of prior notice, stood unimpeached.]

3. There was, then, no necessity for awarding an issue to ascertain those facts; nor was such an order proper on any sound principles. *Olcott* admitted, in his answer, that the judgment was assigned to him as collateral security merely; he had, therefore, no right to hold it for any other purpose than the one for which it was made, and the moment that purpose was accomplished, his rights became extinct, and the assignment void. The consideration or object of the assignment was a debt due from *Wardell* to *Olcott* of $25,000, for which *Olcott* received promissory notes, which were, negotiated by him and were afterwards paid. Even if the notes had not been paid, *Olcott* could not have assigned the judgment for a different purpose, nor could *Roe* have transferred it to the respondents for any other object. The issue was directed to ascertain the fact of notice. But the judgment having been satisfied by the payment of the notes, the question of notice was of no importance, and could not affect its decision, especially, as, if the fact of notice were admitted, the *appellants* had a superior and prior right to have their judgment paid. For the *appellants* used all due diligence to know the situation of the estate of *Eden* before they parted with their money to him, and finding it clear of incumbrance, they lent their money upon the security of a judgment which would be a *lien* on that estate. The judgment was assigned to *Olcott*, to secure a previously existing debt, not one contracted on the condition of that assignment; and it was his duty to have given immediate notice to *Eden* of the assignment, in order to prevent his paying over the money to *Wardell*. It is the same in regard to *Roe*. The respondents advanced no money to *Roe*, but found the assignment among his papers after his decease. There was gross neglect in

*Olcott* and *Roe*, and though no negligence in fact be imputed to the *respondents*, yet they must be affected by the negligence of those under whom they claim ; and in this comparison of rights, the neglect of *Olcott* and *Roe*, may be justly imputed to the respondents.    The *appellants*, therefore, have superior claims to equity.

ALBANY,
Feb. 1806.

Bebee & others
v.
The Bank of
New-York.

4.    A new trial ought not to have been directed, for the sake of letting in the testimony of *Olcott*, which had been rejected at the former trial, on legal and just grounds.    He was a party in the cause, and it is an universal rule that a party in a cause cannot be a witness.    It was said, on the other side, that as the issue was between *John Den* and *Richard Fen*, the technical objection to the evidence of *Olcott* could not be made.    Such an observation is not entitled to a serious answer in a court of equity.    If it were well founded, a *fiction* devised for the purpose of justice, would become the instrument of injustice and oppression.    If the *respondents* wished to avail themselves of the testimony of *Olcott*, they ought, according to the practice of the court, to have applied to have his name struck out of the bill, or, for an order for his examination, saving all just exceptions ;* but though three years had elapsed from the commencement of the suit, and nine months from the granting of an order for the trial of an issue at law, no steps were taken to remove this objection to the admissibility of his testimony.—— Again, *Olcott* was guilty of a fraud in making the assignment, after the notes had been paid, and in assigning absolutely, what he held as mere collateral security.    The consequence of this fraud is to subject him to the costs in chancery.†  On both these grounds, the judge was right in rejecting him when offered as a witness.    If so, a new trial ought not to have been granted for the purpose of admitting him.    Further, a new trial ought not to be granted to let in testimony, which was in the power of the party, and which he did not produce, or which he might have obtained by using ordinary diligence :    And

*2 *Comyns Digest,* Chancery P. 7, 2 Chancery cases, 214.

†*Barrett* v. *Gore* & *Mornfreville:* 3 *Atkyns,* 401.

ALBANY,
Feb. 1806.

Bebee & others
v.
The Bank of
New-York.

it has been shown that the *respondents* had neglected to take any measures to make *Olcott* an admissible witness, though two regular terms of the court of chancery intervened between the first trial, and the application for a new one. There has been, throughout, great neglect, and an unreasonable delay on the part of the *respondents*, who have no claim to the indulgence of a new trial, the granting of which is always matter of sound discretion in courts, who are cautious in exercising this power, for it gives the party an opportunity to speculate as to witnesses. It is a well settled principle, that a new trial cannot be granted, to admit testimony which might have been produced, where there is no pretence of surprise or fraud. In the case of *Standen* v. *Edwards*,[*] the court refused a new trial, though greatly dissatisfied with the verdict, merely to let in evidence which had been kept back. It may be said, on the other side, that *Olcott* was not kept back, but was offered as a witness ; yet the counsel of the respondents must have known that he was incompetent, and could not be received by the judge before whom the cause was tried. Here, too, the judge certified that he was satisfied with the verdict.

* 1 *Vesey, jun.*
134.

5.    The *appellants* ought to have been made *plaintiffs* as they were at the first trial, for the *respondents* are interested to delay the cause.

6.    Another objection to the order is, that it directs *Olcott* to be admitted as a witness, though a party ; allowing the reasons for rejecting him, if he should be rejected, to be indorsed on the *postea.* Now, as judges may differ in opinion, there may be one trial after another, to the very great delay and injury of the appellants.

*Benson* and *Harison,* for the defendants.    The history of the transaction, disclosed by the facts in this case, (which were recapitulated and commented on) exhibits the appearance of mystery and management.    The appellants, it was to be remarked, are said to have lent their money, which consisted part in cash, and part in notes and checks, to *Eden,*

on the 11th *October*, the very day on which the *satisfaction* piece was filed in the clerk's office. This circumstance, in connection with the other facts, was enough to excite a suspicion that the judgment was confessed collusively, and with a view to cover *Eden's* property. There was no delay of payment; no stay of execution. Notwithstanding the notoriety of the conduct of *Olcott* and *Wardell*, and of the application to the supreme court to vacate the satisfaction acknowledged by the latter, the appellants waited until the judgment was reinstated, and the respondents had taken out execution and levied to the amount of $14,000; they then came in, after eight months of silence and inactivity, to claim, and, if possible, to take, the money from the respondents. This was enough to induce the chancellor to scrutinize and probe these transactions to the bottom. It was his duty to take every step which could inform his conscience on the subject, and to satisfy his mind whether the appellants had superior equity on their side or not. The respondents are admitted to be *bona fide* and innocent creditors. It is not pretended that they knew or countenanced the prodigality and extravagance of *Eden*, or the frauds of *Wardell* and *Olcott*. The most, then, that can be said in favour of the appellants is, that they are also *bona fide* creditors; and that there is equal equity between the parties. Now, it is a well-settled principle, that where the *equity* is equal, the party having the legal advantage, and in possession, shall retain it. A person who gets possession of a satisfied term, and has the legal estate, will hold against a person having *equal equity*. It is the same thing where a person having an imperfect title gets possession of a recognizance. In the case of *Wilker* v. *Bodington*, cited from *Vernon*, the complainant came into court to ask a *favour*. Here the respondents are brought into court by the appellants, who ask a *favour*, not the respondents. The court will not grant a favour against a party having the legal right. The priority of judgments makes no difference in the equity existing between the parties. Satisfaction is fraudulently acknowledged on a judgment; another judgment is then confessed, and afterwards

ALBANY,
Feb. 1806.

Bebee & others
*v.*
The Bank of
New-York.

the satisfaction on the first is vacated, and shall the interme-
diate judgment be allowed to gain a preference?

There is no doubt that payments made to the original
creditor, without notice of any assignment, are good. The
principal question in the cause is, whether there was a notice
or not. On this point there was a contrariety of evidence,
and the chancellor very properly awarded an issue to ascertain
the fact. *Wardell* was certainly entitled to little credit. He
was mistaken in one point at least; and *falsus in uno, falsus
in omnibus.* There never was a case in which it was more
proper to direct an issue; if the jury, by their verdict, had
satisfied the doubts existing in the mind of the chancellor,
he would have been prepared to decide on the cause; other-
wise, he would direct a new trial for the purpose of gaining
that light which he wanted to lead him to a right judgment.
As the judge rejected *Olcott* as a witness, the chancellor had
not the benefit of his testimony. The judge who presided at
the trial, it is true, rejected the witness on legal grounds.
But the court of chancery had a right to his evidence. The
objection to him might be valid at law, but not in equity. The
complainant may have a party struck out of a bill, in order
to examine him as a witness. All that the defendant can do
is to move to have a party examined as a witness, saving all
just exceptions. *Olcott's* name being on the record is no ob-
jection to his being a witness in a court of equity. The court
of law are not to inquire who are the parties to the suit. They
have only to see whether the witness be interested or not.
There was no ground for rejecting the witness as a party to a
fraud. He assigned merely all his *right* and *title*, and that
was notice to the assignee to inquire into the title; nor was
he interested. There could not be any surplus to his estate,
and he released any possible interest. It is said he would be
liable to costs; but on what pretence? He was a certificated
bankrupt; and he would no more be liable for costs, in re-
gard to this transaction, than for the original contract itself.
He may be made a party in a suit in chancery, but for disco-
very only, not so as to subject him to costs. He cannot be
liable for any contract previous to his discharge on the mere

allegation of fraud. For *torts* he may be answerable, but not for any thing arising *ex contractu.*

In *Tyrell* v. *Holt,** which was an issue to inquire as to a *fraud,* a party was admitted to be a witness, and the court said, where the party has no interest, he cannot be made liable to costs. *Olcott* could have had no possible interest in the question between the appellants and respondents. But it is said, that a new trial ought not to have been awarded, because the respondents might have had the benefit of *Olcott's* testimony, if they had taken proper measures for that purpose. At the first trial, it was not thought necessary by the chancellor, to direct *Olcott* to be examined, and he could not anticipate the objection that was made to his evidence. But if there were any neglect or mistake on the part of the respondents, still they ought not to be prejudiced, for a court of equity is not governed by the rigid rules of a court of law : it looks to the substantial justice of the case, regardless of matters of mere form. In the case of *Standen* v. *Edwards,†* the party wilfully kept back the witness. But had there been any surprise or mistake, a new trial would have been awarded. In the present case, *Olcott* was offered by the party as a witness, and rejected on a ground unexpected to the party. He was, in truth, not to be considered as a real party ; he never attended a hearing, nor did any person appear for him ; and no decree was sought against him. The objection to the order, that the respondents were made plaintiffs, is of no weight. It was easy to add to the order, that the bill should be taken *pro confesso,* unless the cause were tried in a certain time, or it might be tried by *proviso,* so as to prevent delay.

It is true, that the court, instead of reversing the order, may examine into the merits of the case, as they appear before them, and give judgment thereon. They did so, in the case of *Le Guen* v. *Governeur* & *Kemble,* and *Bush* v. *Livingston.*

[SPENCER, J. It was so decided in *Coe* v. *Furman,* in which judgment was given here on the merits.]

But ought not all persons interested to be made par-

ALBANY,
Feb. 1806.

Bebee & others
v.
The Bank of
New-York.

* 1 *Atkyns,*
451. *Cotton* v.
*Lutterell.*

† 1 *Vesey, jun.*
133.

ties ? If all proper parties are not before the court, it will not proceed to determine the merits, but send the cause back to the court below. This court will not pronounce a *final* decree in a cause, unless they can really put an end to litigation.

*Radcliff* and *Hoffman*, in reply. The appellants appear before this court, as *bona fide* creditors, for a valuable consideration, and with characters as unimpeached as those of the respondents. When they lent their money to *J. Eden*, they searched the records of the supreme court, and found the judgment of *Wardell* to be satisfied. They could do no more. Were they not to rely on the records of the court ? Suppose a mortgagee has lent his money, knowing a prior mortgage to be regularly cancelled, shall he be postponed, or excluded, because the first mortgage was fraudulently cancelled ? When the motion was made to the supreme court, by the respondents, to vacate the satisfaction of the former judgment, the appellants ought to have received notice of the application ; for it is against every principle of justice that innocent and *bona fide* purchasers should be thus affected by the decision of a court, unheard. The supreme court could do no more than a court of equity ; and had the respondents applied to a court of equity to have the judgment restored, the chancellor would have imposed terms : he would have restored their *lien*, but not so as to affect intermediate, *bona fide* incumbrancers, without notice of any fraud. The proceedings in that court cannot, nor ought, in equity, to affect the rights of the appellants. The respondents having, against law and equity, obtained possession of the money on the execution, are to be considered as trustees to the appellants. The two, and the only material facts in this cause, the *notice* and the payment by *Eden* to *Wardell*, are fully before the court, and it is in their power to decide on the merits. All necessary and proper parties appear in the case ; there is no possibility of any surplus property, which the assignees of *Eden* can claim ; nor can the assignees of *Olcott* have any interest in the cause. Both *Eden* and *Wardell* testify, that the payments to *Wardell* were made before the respondents gave notice of the assignment. *Eden* had no motive or in-

terest in speaking falsely. His evidence is confirmed by that
of *Wardell. Olcott*, in his answer, admits that the assignment
was given to him as *security* for certain notes, all of which,
except about $4,000, had been paid. He could not assign any
other, or greater interest, than he held in the assignment to
him. The payment of the notes put an end to the security;
and there is no pretence for saying it was for future ad-
vances. After the payment, *Olcott* and his assigns must be
considered as holding the judgment as trustees to *Wardell*,
the original assignor. If there were any fraud in the con-
duct of *Wardell*, the respondents must look to their *cestuy
que trust*, or to the covenant in the assignment to them, for
their relief. An innocent third person, ignorant of these
transactions, is not to be prejudiced by them. There is not
equal equity in this case; for all the equity is in favour of
the appellants, who relied on the judgment to them, and lent
their money specifically on that security, which is not the
case with the respondents. By the satisfaction of the first
judgment, the legal advantage also, was on the side of the
appellants, who are not to be deprived of it by the subse-
quent order of the supreme court, on a motion in which they
were not heard.

[SPENCER, J. By a rule of this court, of 1786, only one
counsel can be heard in reply. This rule has not been observ-
ed in the argument of this case; but I hope it may be en-
forced in future.]

TOMPKINS, J. The appeal in this cause is from an order
of his honour, the chancellor, awarding a new trial of the
feigned issue. The pleadings and proofs being now before
us, the counsel, according to the course and practice of this
court, have argued the cause at large upon the merits. Inde-
pendently of the objections to the particular order appealed
from, the appellants insist, that a feigned issue was unneces-
sary; and that they are entitled to a decree in their favour,
for the following reasons: 1. Because the judgment of
*Wardell* was satisfied on record, when the appellants fairly,
and for a valuable consideration, obtained theirs; and that
they, therefore, have a prior and superior right to satisfac-
tion.

VOL. I 4 B

ALBANY,
Feb. 1806.

Bebee & others
v.
The Bank of
New-York.

ALBANY,
Feb. 1806.

Bebee & others
v.
The Bank of
New-York.

2. Because the right of *Olcott*, and the assignees of the judgment in favour of *Wardell*, was extinguished by the payment of the consideration for which it was given ; and,

3. Because the payment by *Eden* was before he had notice of the assignment of the judgment.

If either of these grounds be tenable, it will be unnecessary to decide upon the objections to the form of the order for a new trial. My observations will be confined to the first and second points, both of which I consider as conclusive, in favour of the appellants.

The consideration of *Barlow's* judgment was not impeached by the answer of the respondents, and it was not incumbent, therefore, upon the appellants to go into evidence of it. But if such evidence were necessary, it may be collected from the pleadings and testimony. The bill avers a consideration—the answer does not deny it ; and the testimony of *Eden*, uncontradicted upon that point, explicitly proves it.

It will not be denied, that if any fraud were practised by *Eden* and *Wardell*, against the bank, in the acknowledgment of satisfaction, and the appellants were apprised of it when their judgment was obtained, the first point relied upon, by them, cannot be maintained. It is, however, alleged in the bill, that *Barlow's* judgment was obtained, when that in favour of *Wardell* was satisfied on record, *and upon a supposition that nothing was due thereon.* Should it be essential, therefore, to aver in the bill want of notice, the above allegation substantially amounts to it. In my opinion, however, an averment of notice is necessary in those cases only where the party possessing an equitable right, applies for relief against such persons as have obtained a legal right. In such cases, to obtain the relief sought, it is essential to aver, that the legal estate was acquired with notice of the equitable right. There it is an affirmative allegation, and susceptible of proof ; in this case, it would have been the averment of a negative, which could not have been proved, and, therefore, ought not to be required.

The fact of notice was indispensable to support the defence of the respondents, and it, therefore, became requisite for them to set up and prove that the appellants had notice of the equitable claim. Accordingly, in the answer, they insist that *Wardell, Eden* and the appellants, combined to deprive the respondents of their security under the judgment to *Wardell*. This charge necessarily implies, that *Bebee* and *Barlow* had notice of the assignment to the bank. The replication put that fact in issue ; and had it been established by proof, the appellants could not have maintained their first point. What evidence is afforded to establish the fraudulent combination imputed, by the answer, to the appellants ? The answer itself is not evidence of notice, because it is not verified by oath, and because, if it had been, it could not be received as proof of matter in avoidance, which can only be established by testimony *aliunde*. Exclusive of the answer, there is nothing in the cause having the remotest tendency to prove the notice or combination charged in it ; unless the particular relief, sought for by the bill, is construed into an admission of notice. The relief prayed for is, that an injunction issue, and that the judgment in favour of *Wardell* may stand as a security for such sum only as may appear to be really due thereon from *Eden*. The specific relief prayed, is not set forth in the case presented to this court; nor have the counsel for the respondents argued the cause upon the ground that an admission of notice is thereby implied. Had the respondents entertained an opinion, that notice was conceded by the bill, it is to be presumed that they would have relied and insisted upon it in their answer, as a conclusive defence. But, whatever might have been their impression on that point, it is sufficient to say, that admissions which will conclude a complainant, are only to be sought for in that part of the bill which contains the state of the case, or title, upon which he relies for relief. Even a mistake in the special prayer of the bill, provided there be a general prayer for such other relief as the nature of the case may require, as there is in this bill, will not deprive the party of that relief to which the nature of his case entitles him. (*Mitford*, 38.

2 *Mod.* 91–2.) If, therefore, in this case, the appellants, when they filed their bill, were advised that the particular relief solicited by them, was the utmost they could obtain, in consequence of the order of the supreme court, in relation to *Wardell's* judgment, that misapprehension of their rights ought not to prejudice them. They are, therefore, in my opinion, to be regarded as *bona fide* incumbrancers, without notice, for a valuable consideration, and their prior right to satisfaction is evident, unless the proceedings of the supreme court, in vacating the satisfaction of the judgment to *Wardell,* deprives them of that right. The effect of those proceedings will now be considered.

The respondents being assignees of a *chose in action only*, never possessed a legal *lien* upon the property of *Eden.* Subsequent to the entry of satisfaction, they surely had no such *lien* ; and it is equally indisputable that *Barlow's* judgment, obtained prior to the order to vacate the satisfaction, did give him a legal *lien.* When the supreme court interposed its authority, it assumed equity powers ; and the proceedings there cannot be deemed to have any greater operation than a similar interference of the court of chancery would have had. It is an invariable rule in equity, that where one party has obtained a legal advantage, and equity is equal, not to disturb the legal right. In this case the appellants had not only fairly obtained a legal superiority, but appear to me to have had the equity on their side, inasmuch as they loaned their money, expressly upon the security of their judgment, whereas the bank obtained their assignment to avert, if possible, the loss of a previously existing debt, created by the imprudence of their agent. Under such circumstances, it is not to be presumed that the court of chancery would have postponed the legal *lien* of a party, not before the court, having no notice of its proceedings, and not heard. Both the counsel, and the supreme court, seem to have viewed the effect of the order to vacate the satisfaction of *Wardell's* judgment in the same light in which I have considered it ; because, a leading reason assigned to induce that court summarily to interfere.

ALBANY,
Feb. 1806.

Bebee & others
v.
The Bank of
New-York.

was, *to prevent the intervention of new liens*. But it would not have been material to press an immediate *vacatur* of the satisfaction, if such new *liens* would not have been entitled to prior satisfaction. The court intended to place *Eden*, *Wardell*, and the assignees of *Wardell's* judgment, who were the only parties before them, in *statu quo* ; and to give their order a greater operation, or to conclude third parties by it, would produce manifest injustice. They surely never intended to decide upon the rights of persons who were without notice of the application, and unheard.

.. With respect to the second point, it is observable, that *Olcott's* answer admits the truth of *Wardell's* testimony as to the object of the assignment to *Olcott*. The judgment was to be held by him as collateral security only. Neither this fact, nor the fact of payment by *Wardell* to *Olcott*, of the debt intended to be secured, will be affected by the determination of the feigned issue. We must, therefore, decide them upon the proofs as they now stand. I have before observed, that *Wardell* and *Olcott* unite in saying, that the assignment was made for a specific purpose only. But they are at variance in regard to the sum intended to be secured, and with respect to the payment of that amount. Upon this point, however, *Wardell* is clearly entitled to credit. He not only specifies the particular notes, which the assignment was intended to secure ; but, in his account with *Olcott*, states to whom they were transferred and paid. This enabled the opposite party to detect the falsehood, if any, in the relation of *Wardell*. On the other hand, *Olcott's* answer contains a mere averment of a conjectural balance, at the time of the assignment to *Roe*, without referring to any accounts, admissions of *Wardell*, notes, or other documents, to support the truth of his statement. Besides, to gloss over his conduct in regard to *Roe*, must have been a powerful motive operating on his mind. If he had admitted, that nothing was due from *Wardell* to him, when he assigned the judgment, he would thereby have charged himself with a gross imposition upon *Roe*.

Bebee & others
v.
The Bank of
New-York.

* 1 *Vesey, jun.*
249.

To avoid this imputation, he introduces his belief, at that time, which belief is not, afterwards, fortified by any documents, or proof.

The purpose of the assignment, and the payment of the consideration of it by *Wardell*, are, to my mind, satisfactorily established.

In *Davies* v. *Austen*,* it is laid down, by the lord chancellor, as an universal rule, that a purchaser of a *chose in action*, must always abide the case of the person from whom he buys. If, then, the consideration, for which the judgment was signed to *Olcott*, were satisfied, all his right was extinguished; and, therefore, *Roe* and the respondents, according to the rule laid down in the above case, acquired no right by the assignments, if they were made after payment by *Wardell*; and if the notes were paid, subsequent to those assignments, that payment extinguishes their right.

I am, therefore, of opinion, that a feigned issue was unnecessary; and that, as the respondents have, by their answer, admitted the receipt of the proceeds of *Eden's* real estate, they are to be regarded as trustees for the appellants, for the amount due upon the judgment, in favour of *Barlow*, and ought to account for the same accordingly; and that the order of his honour the chancellor, awarding a feigned issue, must be reversed.

SPENCER, J. I forbear to repeat the facts and circumstances of this case; they have been so often mentioned, that no member of the court can be unacquainted with them.

The supreme court, in vacating the satisfaction of the judgment of *Wardell* against *Eden*, exercised a jurisdiction, until very recently, within the acknowledged province of a court of equity alone. The protection of the rights of an assignee of a *chose in action* by courts of law, is perhaps essential to the administration of justice; it certainly avoids great expense and delay to suitors, and it, therefore, as far as this case goes, meets my decided approbation. But, when a court of common law does interpose, to protect a party vested only with an equitable right, and such interposition affects the rights of third persons, some known

standard must be resorted to, to test the effect of their pro-
ceedings. There is none so appropriate as that furnished
by considering the proceeding as having taken place in a
court of equity. It is an universal and established principle,
as well in that court, as indeed in all others, that no man is
to be condemned unheard ; the rights of no one can be im-
mediately affected by a judicial proceeding, to which he is
not a party. This proposition is so just and essential, that
I should think it weakened by citing authorities in its sup-
port. It comes home to the common sense of every man ;
it is, and it must be, a first principle. The appellants, or those
they represented, were never called on by any citation or
process, to defend their rights before the supreme court when
the satisfaction was vacated. The respondents' counsel, un-
able, and, I trust, unwilling, to assert, that the order of that
court affected a party not before it, resorted to reasoning to
induce this court to believe the appellants guilty of *laches*,
in not appearing, and as thereby forfeiting their rights, be-
cause they might have heard of the pendency of the motion
to vacate the satisfaction. It would, I think, be extravagant
in this court, to suppose a fact, which, if it were material, and
could be proved, has not been made out. It would be intro-
ducing a new principle in judicial proceedings, to require of
a party to volunteer his appearance. This objection is so ob-
viously untenable, as to require no further notice.

As it regards the appellants, then, I consider the satisfac-
tion of the judgment as unaffected by the proceedings between
the bank and *Eden*. It follows, that the appellants have
the legal *lien* on the real estate of *Eden*. It then remains to
be examined, whether the appellants have equal or superior
equity to the respondents. If it should appear that they have
either, their right to the proceeds of the real estate of *Eden*, to
the extent of their judgment, necessarily results. It has been
urged, that the circumstance of *Barlow's* lending money to
*Eden*, on the very day the satisfaction was entered, affords
suspicion. I agree, that it is a circumstance somewhat extra-
ordinary ; but I do not think it warrants me in imputing to
them an act of fraud on the party : fraud is odious, and not

ALBANY,
Feb. 1806.

Bebee & others
v.
The Bank of
New-York.

to be presumed. Had there been no proof of the money advanced by *Barlow*, I should consider the giving the bond, and confessing judgment, as *prima facie* evidence of the fairness of the debt ; but when we recur to the evidence, we find *Joseph Eden* testifying expressly, that *Barlow* lent him $8,000 in cash, and his notes and checks to the amount of $12,000 more. This testimony is uncontradicted, and it being an important fact in the cause, the respondents, if they would have controverted it, should have gone into adequate proof. In vain are we told, that *Barlow* and *Bebee* were men of bad characters, and incompetent to advance to *Eden* to that amount. These are facts which must be proved, before they can produce any effect ; whilst they rest on suggestion, they can have no influence.

It is to be observed, that the bank got hold of the assignment of *Wardell's* judgment against *Eden*, as a plank by which to save themselves from the losses sustained from *Roe*, who obtained it to mitigate the loss occasioned by *Olcott*. Neither the bank nor *Roe* made any advances on the faith of that assignment. As it regards the appellants, it was not until after search at the proper office, that they advanced their money, on the faith of the security afforded by the real estate of *Eden*. When the appellants gave credit to *Eden*, they had a *lien* on his real estate. This *lien* has been taken away, but in such a manner only as to change the remedy ; it still exists in the view of a court of equity. The appellants having equal, and, I think, superior equity to the respondents, and having the legal preference, I consider them entitled to the proceeds of the real estate of *Eden*, on every principle of justice and equity. And here I might terminate my inquiries ; but the importance of the cause, both as to principle and value, demands of me the examination of some other points.

It is material, in ascertaining the rights claimed by the bank, to consider the nature and effect of the assignment by *Wardell* to *Olcott*, that by him to *Roe*, and by *Roe* to the bank.

It is an incontrovertible proposition, that the assignee of a *chose in action*, takes it, subject to all the equities it was

liable to in the hands of the assignor ; or, in plainer language, the " purchaser must abide by the case of the seller."*

ALBANY,
Feb. 1806.

Bebee & others
v.
The Bank of
New-York.

The reason and justice of this rule is obvious ; the holder of a *chose in action* (excepting such as are made negotiable for the advancement of commerce) cannot alienate any thing but the beneficial interest he possesses ; he cannot vest the legal right to sue for, and enforce, in the name of the assignee, the payment of a debt, secured by a bond or judgment. When, therefore, *Wardell* made the assignment to *Olcott*, he took the judgment, subject to all equities existing between *Eden* and *Wardell;* and when the subsequent assignments were made, *Roe* and the bank, respectively, assumed the situation, and stood in the place of *Olcott*, as related both to *Wardell* and *Eden.* It would be absurd to pretend, that because the assignment to *Olcott* was general in its terms, he could, therefore, transfer a greater interest than he held in the judgment. Had *Roe* and the bank, instead of taking the assignment for better or worse, and with the hope of realizing something, which they clearly did, made advances to the whole amount, the legal consequence would be the same. In the present case, they have not the pretext for saying they were imposed on by the generality of the assignment to *Olcott*, because they gave no new credit. A bond on which there are no indorsements, carries on its face strong presumption, if it be a recent one, that it is unpaid ; still, an assignee must abide by the case of his assignor, if it has been paid. If it be illegally obtained, the obligor will avoid it. It becomes necessary, then, to inquire, for what purpose the assignment was made to *Olcott*, and whether that purpose had been satisfied.

*Wardell* is the only witness who speaks directly to these facts ; he says, that the judgment was assigned to secure to *Olcott* the payment of $25,500, he then owed him, and for which he also gave three promissory notes ; that these notes *Olcott* negotiated, and that they have been paid, or, at all events, *Olcott* is not responsible on them, as an indorsor. In support of the fact, that the judgment was assigned only as a security for the notes, he presents an account current with *Olcott*, by which there appears a balance due to *Wardell.*

* 2 *Vernon*, 192.
1 *Eq. Ab.* 45.
1 *Vesey, jun.*
249.

To oppose these facts, *Olcott's* answer is resorted to. It admits the fact, that the assignment was made to secure the notes, and that they have been negotiated; but it asserts, that it was also to secure to him future advances and responsibilities ; and he adds, that *Wardell,* being indebted to him, as he believed, at least, in $20,000, and he being indebted to *Roe,* he made the assignment, as a security to him. If *Olcott's* answer receive all the credit due to the deposition of a witness, and his character and conduct had been fair, still I think *Wardell's* testimony entitled to superior credit. He furnishes his *data* for saying that he owed *Olcott* nothing beyond the three notes. On the other hand, whether *Olcott,* in stating the debt from *Wardell,* includes in his estimate the notes, or on what grounds he made the assertion, we know not. He has produced no books, no documents, to support him ; but is vague and indefinite. *Wardell's* competency, as a witness, has been questioned ; I perceive no reason to doubt either his competency, or his disinterestedness ; his interest, if any, is to uphold the judgment, and his testimony goes to destroy it. He then swears against his interest, and this, instead of invalidating, strengthens his credit. It is alleged, that he fraudulently entered satisfaction of the judgment. This depends on the verity of his evidence, as to the nature of the assignment to *Olcott* ; if it was, as he states it, then, on the payment of the notes, he alone was entitled to acknowledge satisfaction.

Feeling myself constrained to yield the greater credit to *Wardell,* it follows, that the object of his assignment to *Olcott* was fulfilled by the payment of the notes ; and from the principles I have before laid down, *Olcott's* interest in the judgment ceased, and those deriving title under him, being invested with no other or greater right than he had, can, neither on legal, or equitable principles, pretend to a right emanating from one who had ceased to have any. I will only observe, that by the assignment to *Olcott,* he acquired an equitable interest, commensurate

ALBANY,
Feb. 1806.

Bebee & others
v.
The Bank of
New-York.

with the object for which it was made. His transfer of the assignment, vested his assignee with his equitable interest and no more. The assignment of an assignment, acquires no negotiable quality, and the last assignee cannot, it appears to me, be clothed with a greater title than the first assignor. On either, and both of these grounds, I am fully of opinion, the appellants are entitled to the decree of this court, for the money produced by the sale of *Eden's* real estate. It necessarily follows, that the issue, to try whether *Eden* had notice of the assignment to *Olcott*, and what sums were paid by him to *Wardell*, and the periods of those payments, was irrelevant and immaterial.

I am, nevertheless, disposed to bestow some consideration on the order appealed from. After the first order for the trial of the feigned issue, and a verdict for the appellants, which affirmed the payments by *Eden*, and negatived the notice to him, of the assignment by *Olcott*, a second trial was ordered, on the ground, that *Olcott* was a material witness, and through the mistake or inattention of the respondents' counsel, had not been struck out of the bill. If his name's being in the bill, did really incapacitate him as a witness, I think the respondents concluded by their *mistake* or *inattention*.

The rule, both at law and in equity, is to refuse a second trial, where the propriety of the verdict is not impeached, as against law or evidence, though there be material evidence for the party, against whom the verdict has passed, which was not adduced ; unless it be shown to have been discovered after the trial, or unless the verdict has been obtained by fraud or surprise.* If mistake in practice, or inadvertence in attention, furnished reasons for a new trial, it would encourage litigation, and reward ignorance and carelessness, at the expense of the other party.

*1 *Vesey, jun.* 134.

The materiality of *Olcott's* testimony was well known before the trial, because, in his answer, he alleges, that soon after the assignment, he gave notice to *Eden*. The

ALBANY,
Feb. 1806

Bebee & others
v.
The Bank of
New-York.

respondents cannot pretend, that by fraud or surprise they were prevented from having his name struck out of the bill. I am inclined, however, to think, that, notwith-standing his name was in the bill, he was a competent witness. Most clearly *Olcott* had no interest in the cause; his contingent right in the surplus of his estate, he releas-ed to his assignees; no decree could possibly pass against him; but he might, it has been said, have possibly been pun-ished in costs. From the time of lord *Hardwicke*, courts of law have been liberal in the admission of witnesses; and where the interest is not immediate or certain, they admit the witness as competent, and suffer the objection of a remote, contingent, or possible interest, to go to his credit. On the score of authority, I think *Olcott* a good witness; the cases of \**Cotton* v. *Lutterell*, of *Piddock* and *Brown*, and *Man* and *Ward*, are strongly in favour of his admission.

*1 Atk. 451. 3
Pr. Wms. 289.
2 Atk. 238.

Did the cause rest, therefore, on the propriety of a new trial, I should be for affirming the decree. The other points on which I have observed, render any investiga-tion of the facts forming the feigned issue, unnecessary and superfluous.

From a suggestion made by an honourable member of the court, I have taken the trouble to examine the bill and answer, having, in forming of my opinion, presumed that the parties would present every fact in their re-spective cases most favourable for themselves. The bill, it is true, states all the circumstances attending the trans-action, and particularly the various assignments of the judgment in *Wardell's* favour against *Eden*, and it con-cludes with a special prayer, that that judgment may not be deemed a *lien* beyond the balance due on it from *Eden* to *Wardell*. It also contains a general prayer for such relief, as in equity and good conscience, the party is enti-tled to. In the whole course of the very elaborate and in-genious arguments submitted by the respondents' counsel, no stress was placed on either of these points. It was

ALBANY,
Feb. 1806.

Bebee & others
v.
The Bank of
New-York.

not pretended that the appellants had notice of the situation of *Wardell's* assignee, or that they knew, when they lent their money, that the bank was interested in the judgment. Most clearly there is no evidence to warrant such arguments. I do not think that we are called upon to be *astate* in finding out formal objections, which never occurred to the counsel, to deprive the party of a just right, or to turn them round ; but since they have been stated, I will briefly proceed to discuss them. It by no means follows, that because the appellants, when they filed their bill, knew the situation of the bank, that they had that knowledge when they lent their money and took their judgment. Neither does their omission to state their ignorance of those facts, at the time of the loan, justify a presumption of such knowledge, especially, after the bank had, in their answer, charged them with collusion, with *Wardell* and *Eden*, to injure them, and to deprive them of their security, under *Wardell's* assignment, and have wholly failed to substantiate the charge. This allegation of collusion, made by the bank, was put in issue by the appellants' replication, and the *onus probandi* was thrown on the bank. If, therefore, it would have been more technical to have denied notice in the bill, substantially, that point has been at issue, and is found for the appellants. It may be true, that if A contract in writing with B, for the purchase of land, and C takes a conveyance subsequently, and a bill be filed against him for a specific performance, charging collusion with B, C must, in his answer, not only make out that he is a fair *bona fide* purchaser, for a valuable consideration, but without notice of A's interest. The distinction is manifest between a bill and answer. Every complainant has a right to a full answer to the facts charged, and when charged, and not denied, it may be deemed an admission of the facts. The complainant's bill is no evidence for him, and his omission to state a fact, cannot furnish evidence of the fact, especially when insisted on as a defence, and not established.

ALBANY,
Feb. 1806.

Bebee & others
v.
The Bank of
New-York.

With respect to the prayer for a specific relief, it is to be observed, that probably the appellants' counsel, in drawing the bill, might have had full confidence in the fact of *Eden's* paying off the judgment, or nearly so, without notice, and he might, and, probably, did suppose the *vacatur* entered by the supreme court, conclusive on the appellants. It would be rigorous, when a party had proved himself entitled to the decree of a court, to say to him, " you ought to be relieved, but yon have put your right on a false basis." Fortunately, for the justice of the case, this is not the law. " It is usual (says Mr. *Mitford* in his excellent system of chancery proceedings) to add to the prayer of the bill, a general prayer, for that relief which the circumstances of the case may require, that if the plaintiff mistakes the relief to which he is entitled, the court may yet afford him that relief to which he has a right." Mr. *Hinde*\* confirms this, in nearly the same words. In the case of *Hollis* v. *Carr*,† the court decreed a relief under the general prayer, distinct from the special relief, prayed. I conclude, therefore, that there exist no objections in this cause, which might entangle justice in the net of form.

\* *Hinde's Practice*, P. 17.
† 2 *Mod.* 91.

Various judgments of this court, establish the precedent, that on appeals from chancery, and where the merits are fairly before the court, they will pronounce a final decree ; this case falls within those precedents. It is therefore, my opinion, that the appellants be decreed to receive the nett proceeds of the sale of *Joseph Eden's* real estate, under the execution in favour of *Wardell.*

THOMPSON, J. Though the argument of the present appeal has embraced a great variety of questions, I shall not examine all of them, since, according to the view which I have taken of the subject, I think the substantial merits of the case, confined to a narrow compass. In order, justly to estimate the rights and claims of the parties, we must examine the situation in which they respectively stand, and the relief sought for, and which can be afforded, under the

pleadings before this court. Both parties claim to be judgment creditors of *Joseph Eden.* The judgment under which the respondents claim, is oldest, in point of time ; but satisfaction thereof, was entered on record, when the appellants' judgment was entered up. This satisfaction was, however, adjudged by the supreme court, to have been fraudulently acknowledged, and was, of course, vacated. The respondents being assignees of the judgment under which they claim, one part of the appellants' allegation in their bill, is payment by *Eden,* to *Wardell,* the original plaintiff on record, without notice of assignment. After the *vacatur* of satisfaction, as before mentioned, the respondents took out execution, and were proceeding to enforce it. To stay the proceedings, the appellants filed their bill, and the relief particularly prayed for is, that the respondents may be restrained from further proceedings at law, upon the judgment assigned to them, or upon the execution issued thereon ; and, that an account may be taken of the monies paid on the said judgment ; and, that the said judgment may be decreed to stand as security for such sum only, as may be really and truly due thereon, by *Joseph Eden ;* concluding with a general prayer for such other and further relief in the premises, as shall seem meet. A part of this particular relief prayed for, being to have the benefit of all payments made by *Eden* to *Wardell,* and that the judgment should stand as security for the balance, would seem, in some measure, implicitly to admit, that the judgment under which the respondents claim, is entitled to priority. But, according to the course of chancery proceedings, a party is not confined to the particular relief asked for in the bill, but under the general prayer, is entitled to such relief as the circumstances of the case may require. The reason of inserting the general prayer is, that if the party mistake the relief to which he is entitled, the court may afford him that to which he has a right. The relief, however, must be agreeable to the case made by the bill, (*Mitford's Pleadings,* 38) and the court will not, in all cases, permit a bill, framed for one purpose, to answer another, especially, if the opposite party may be thereby surprised, or

ALBANY,
Feb. 1806.

Bebee & others
v.
The Bank of
New-York.

prejudiced ; neither of which has been pretended in the pre-sent case. I the more readily avail myself of the general prayer, in order to enter into the merits of the case made by the bill, because, such has been the course pursued by the counsel on both sides, without claiming to be confined to the particular relief prayed for.   But a part of the particular re-lief prayed for here, is, that the respondents may be restrain-ed from further proceeding on the judgment assigned to them.   Full relief, according to the existence of facts, at the time the bill was filed, would have been afforded the appel-lants, by decreeing a perpetual injunction. In the bill, filed in the court below, no notice is taken of the $14,076 54 cts. acknowledged by the respondents, in their answer, to have been received by them.   This is to be accounted for only on the supposition, that it was received between the time of filing the bill, and the coming in of the answer ; which is render-ed probable by recurring to dates.   It is not stated in the an-swer, when the money was received ; but it appears, that the execution could not have been issued, until after *April* term, 1801 ; and the bill was filed on the second of *June,* following.   If the respondents were not entitled to recover this money, under the judgment assigned to them, they must, in equity, be deemed to hold it as trustees for the appellants. Here, then, arises what I consider the material question in this case, namely, which judgment shall be entitled, to priori-ty ?   Admitting the appellants to have been ignorant of the assignment of the first judgment, and ignorant of the fraudu-lent satisfaction entered on record, at the time they loaned their money, and took their judgment, I cannot entertain much doubt that they must be considered as having the first legal *lien.*   The satisfaction entered on record, must, as to all persons who stand in the situation of innocent pur-chasers, for a valuable consideration, be deemed valid and effectual ; and the restoration of the judgment, as it respects their rights, can only be considered as forming a *lien* from the time it was so restored.   Unless such be the legal opera-tion, it would lead to the greatest injustice, and render inse-cure and uncertain the *lien* of judgments on real property ;

and in vain would resort be had to our public records, to as-
certain incumbrances. There is nothing in the rule of the
supreme court, ordering a vacation of the entry of satisfac-
tion, from which it can be inferred, that the court intended to
express any opinion, as to the effect such proceedings would
have on the rights of third persons. This was, doubtless, in-
tended to be left open to subsequent determinations, as cases
might arise, probably, not being apprised of any intermediate
judgments between the entry of satisfaction, and the resto-
ration of the judgment. It never could have been intended
to conclude the rights of parties, without giving them an op-
portunity of being heard. If the appellants have a prior le-
gal right, and the equity between the parties be equal, it is
not denied that, according to sound and well established prin-
ciples, the legal right must be preferred. It appears to me,
that not only the legal, but equitable right, is on the side of
the appellants. They loaned their money expressly on the
faith of the security arising from the *lien* created by their
judgment, having taken the precaution first to examine the
record, and ascertain that no prior judgment existed that
would impair their security. The respondents took their
assignment, as collateral security for a debt, not created on
the faith of any *lien* arising from the judgment. The as-
signee of a judgment usually requires, and takes from the
assignor, covenants to secure himself against the latter's
doing any act to invalidate the security : such appears to
have been the case in the present instance. And if the cove-
nant of the assignor be not sufficient, it is in the power of the
assignee to require some other security, or he may refuse to
take the assignment. No such opportunity to guard against
loss is offered to those who are strangers- to the assignment ;
their knowledge of parties interested in judgments must be
derived from the record, unless actual notice be given by
the assignee, or a knowledge of the assignment is brought
home to the opposing claimant in some other way. Can it
be doubted, that if the assignors, from, and through whom
the respondents' claim, were responsible persons, resort
would and ought to be had to them for indemnity ? I have

thus far examined this question, on the supposition that the appellants are to be viewed in the character of *bona fide* purchasers, without notice of the assignment of the judgment under which the respondents claim. It remains to be inquired, whether the appellants, according to the case presented to the court, are entitled to such character. Because, if they had notice of the assignment, they ought, perhaps, to be considered as conniving at the fraudulent satisfaction, and their *lien*, on that account, be postponed.

It is not pretended that the appellants are chargeable with express notice from the assignees ; nor can I see how they can be by implication. No negligence is imputable to them ; there was no record of the assignment to which they could have resorted for information. Nothing is stated to have come to their knowledge, which ought to have put them on inquiry. It is true, they have not alleged in their bill, a want of notice ; and this, perhaps, may afford some grounds for an inference against them. I am inclined, however, to think that no such allegation was necessary. They certainly would not have been required, neither was it practicable, to prove a negative. Where the object of the bill is to set aside the legal estate, on some equitable grounds, it may be necessary to allege want of notice, because this is the very foundation upon which the claim to equitable relief is built. But, in the present case, as I have endeavoured to show, the appellants are in possession of the legal right, and we are to examine the claims of the respective parties, in the same manner as if the respondents had been complainants in the court below. But, admitting that a want of notice of the assignment ought to have been alleged in the bill, it appears to me this defect ' cured by the subsequent pleadings and acts of the parties. The respondents, in their answer allege, that *Wardell*, combining with *Eden* and the appellants, to deprive them of their security under the judgment, acknowledged satisfaction of it, and caused the satisfaction to be entered on the record. This allegation is denied by the replication ; the question of notice was thereby put in issue between the parties, the affirmative of which is on the part of

the respondents, and which they are bound to prove, if they
are to avail themselves of it for the purpose of avoiding the
legal estate, or *lien.* It was not pretended on the argument
that, according to the case presented to the court, the appel-
lants were chargeable with notice of the assignment. The
controversy was put on totally distinct grounds, which I
construe into a waiver of the objection, as it respects the
pleadings.

If I am correct, then, in the propositions which I have en-
deavoured to establish, that the appellants must be consider-
ed as in possession of the legal right, and that they are not
chargeable with notice of the assignment of the judgment
under which the respondents claim, then no issues were ne-
cessary. There was no contrariety of evidence on those
questions. The equity was, at least, on the side of the ap-
pellants ; and having the legal right with them, they were
entitled to a decree in their favour, restraining the respon-
dents from all further proceedings on the judgment under
which they claimed, and directing them to pay over the mo-
ney which they, in their answer, acknowledged to have re-
ceived ; and which, according to the circumstances of the
case, they must be considered, in equity, to hold as trustees
for the appellants. Although the immediate object of the bill
could not have been the recovery of this money ; because,
as I have endeavoured to show, it had not been received by
the respondents when the bill was filed ; yet, if the bill par-
takes of a double aspect, and such a case is presented, as en-
titles the appellants to relief, I see no good reason why it
should not now be granted, without turning the parties round
to litigate anew, and bring forward their claim in a different
shape, especially, as no surprise or prejudice is alleged by the
respondents to arise to them, by adopting this course, it not
being pretended that any new light, on this point, can be
given. The verdict of the jury, one way or the other, upon
the issues ordered to be tried, would not, according to my
view of the case, alter the rights of the parties, before this
court. Those issues extend only to an inquiry respecting
the notice which *Eden* had of the assignment of the judg-

ALBANY,
Feb. 1806.

Bebee & others
v.
The Bank of
New-York.

ment, and to the payments which he had made thereon previous to receiving such notice, and not to any knowledge which the appellants had of such assignment. Without, therefore, examining any more of the points which have been raised in this case, and very elaborately argued, I am of opinion that the order, or decree of the court of chancery, ought to be reversed.

[LIVINGSTON, J. having been formerly concerned as counsel, gave no opinion.]

KENT, Ch. J. I shall be obliged to differ from my brethren, who have preceded me. This I do, with deference and reluctance, but under the pressure of superior duty, to pursue and declare the conclusions of my own judgment.

The most important question which has been raised in this cause, is, whether the appellants are to be considered as having a priority to the respondents, in respect to the judgments against *Eden*. This pretension ought first to be examined and settled. If the appellants are entitled to a preference, all the other points in the cause become immaterial, for, as between two contending judgment creditors, he who has the prior judgment, must be first paid.

The manner in which this question is brought before the court, is a little singular, and deserves attention. The appellants filed their bill in the court below, on no other ground of complaint, than that the respondents were proceeding, at law, to collect the amount of *Wardell's* judgment, after it had been once paid. It was their only grievance, that the judgment was likely to be twice collected, and that as *Eden* was insolvent, the judgment of the appellants must remain unsatisfied. The cause proceeded to a hearing, and an issue was awarded on the single question of payments by *Eden*, before notice of the assignment. In the awarding of this issue, the appellants acquiesced, and the point raised in this court was undoubtedly an after-thought, as it is not so much as once suggested in the bill, and as it formed no part of the litigation below. But, after contending so long, under the limited claim of *subsequent* judgment creditors, the appellants come with a suspicious countenance before us, at

this late hour, and under the same bill, to claim the benefit of *prior* judgment creditors. In most cases, such conduct would justly be deemed a waiver, or abandonment of the latter claim ; for, if the present pretension of the appellants be well founded, then all the examinations and trial below, about notice to *Eden*, and payments by him to *Wardell*, were idle and nugatory, and an abuse of the time of the court. If, however, the appellants be not absolutely concluded from setting up this new ground of title, yet their conduct forms a powerful reason why this court should listen to it with caution and distrust. So prominent a point, in a cause, could not have slumbered so long, without a diffidence in the facts, that were requisite to maintain it. The proofs of their pretension to be *bona fide* judgment creditors, without notice, ought, at least, to be of the most positive kind, without any shadow of doubt or ambiguity.

The acknowledgment of satisfaction, by *Wardell*, was vacated by the supreme court, on the ground that, as *Wardell* had previously assigned over his right and interest in the judgment, his interference in cancelling that judgment, without the knowledge and consent of the assignee, was an act fraudulent and void. After he had parted with his interest in the judgment, he had no more power over it, than if he had been a stranger to it ; and his attempt to vacate it, was a violation of right. The supreme court, however, never meant to decide on the claims of an intervening creditor, who had obtained a regular judgment in the interval between the time of the entry of the satisfaction, and the subsequent *vacatur* of it. Such a case was not then before the court ; but such a case is now urged in the present cause, and, under the circumstances in which it is presented, it merits our most serious consideration, because, it touches on some of the soundest and best settled principles in our equity system. If this intervening judgment creditor, should come before us, without any knowledge, at the time, that the satisfaction had been granted, by a man unauthorised to make it, he would, undoubtedly, have a very good claim not to be disturbed by the court. For, if a creditor

who takes a judgment, or mortgage, should previously inspect the records, and find all antecedent judgments, and mortgages cancelled, and should have no knowledge how they came to be cancelled, beyond what the record speaks, a court of equity would, in that case, refuse any aid against him, notwithstanding it should afterwards appear, that the prior judgment, or mortgage, had been fraudulently cancelled. But I am warranted, by the uniform current of the chancery decisions, in saying, that in such a case, the court would refuse to interfere between the two creditors, and would leave him, who had any legal advantage, to retain it. The court would not act against either, because the equity of the parties would be equal. A creditor who comes in with his *lien*, after all antecedent incumbrances appear to be satisfied, has, no doubt, a strong claim to our protection. But the prior creditor, whose judgment, or mortgage, has been cancelled fraudulently, and without his knowledge, has a claim equally strong and inviting. They are creditors equally innocent, and equally to be favoured ; and I am satisfied, that the court of chancery could not, consistently with its established principles, help the one, to the prejudice of the other. Its answer would be, that where the parties stand equal before us, he who has the advantage at law, shall be left to enjoy it, or, according to the lively allusion of Sir *M. Hale*, the party that has been fortunate enough to seize a *plank in the shipwreck*, shall not have it torn from him by the court. If, therefore, the appellants did really stand before us, as judgment creditors, without notice of *Wardell's* assignment, we should be obliged to dismiss them, without affording them, on that ground, any aid or assistance against the bank. Allow them all that they *now* pretend to be, we could do no more than this, without introducing principles, and precedents, unknown to our jurisprudence. I have supposed, that in case of no notice, the equity of the parties might stand equal. This ought not to be denied by the appellants. There is no doubt, but that the bank took the assignment from *Roe*, for a full consideration, and to save themselves from a grievous loss,

and without knowledge of any antecedent transaction, calculated to defeat it. They cannot be deemed guilty of negligence, in not recording the assignment, because it was not an act required by law, to consummate their title. There was no office that was bound to record it. It is never done in practice, and there were, indeed, but four days between the assignment and the new judgment. It is idle, therefore, to impute any neglect to the respondents, in diminution of their equal equity. On the other hand, I forbear to dwell on the fact, that $12,000 of the appellants' demand, arose from notes and checks, and that weare left wholly without explanation, whether those notes and checks proceeded from the appellants themselves, or whether they were not notes and checks of *Eden*, which had been purchased up at a speculating discount in the market. If the latter was the case, then, indeed, I should agree that the equity of the parties was not equal, because, the one side would be struggling to avoid a loss, whilst the other would be striving to gather in, and secure the harvest of his speculations.

I have hitherto considered the appellants as if they had come here, in the character of *bona fide* purchasers, without notice, and, even then, they could have no relief from us ; all we could do, would be to dismiss their bill, or to decide the cause on the grounds litigated in the court below. But the fact is, that the appellants do not come before us in that character. They are to be considered as acting *with notice*, that *Wardell* had assigned over his interest in the judgment, at the time he acknowledged satisfaction. This inference appears to me, to be the inevitable conclusion of law, from the silence of the appellants in their bill, as to the fact of their want of notice. If a party will *claim* a benefit, resulting from the want of notice, and the truth of the fact is within his own knowledge, he shall be presumed to have had notice unless he denies it. *Qui tacet consentire videtur.* The appellants, from their own shewing, prove the acknowledgment of satisfaction, by *Wardell*, to have been a nullity, and a fraud ; for they state his, and the subsequent assignments of the judgment, but they omit to

ALBANY,
Feb. 1806.

Bebee & others
v.
The Bank of
New-York.

state when they first came to the knowledge of these assign‑ ments, and for aught that this court can know to the contra‑ ry, it may as well have been before, as after the date of their judgment. They content themselves with saying merely, that their money was loaned, after satisfaction had been entered, and upon *a supposition that nothing was due*. This supposition is perfectly consistent with a knowledge of the assignments, and may have proceeded from a credulous reliance on the assurances of *Wardell* and *Eden*. It is a rule in chancery, not to aid a *cestuy que trust* against a purchaser from a trustee, if he be a purchaser for a valuable considera‑ tion, and without notice of the trust. (2. *Fonb.* 151--2. 3 *Bro.* 264. *Williams* v. *Lambe*, 2 Vezey, jun. 454. *Jerrard* v. *Saunders*. 3 *Vezey*, jun. 222. *Strode* v. *Blackburne.)* But no instance is to be found, in which such purchaser is protected, unless he aver himself to be a purchaser, without notice of the trust. He is bound to state, affirmatively, in his plea, that he had no notice, and whether he claims the benefit of the purchase in the character of complainant or defendant, it can make no difference in the case. The ge‑ neral rule of pleading in chancery, is, that whatever is es‑ sential to the rights of the plaintiffs, and is .necessarily with‑ in his knowledge, must be alleged positively, and with precision. *(Mitford,* 40.) This rule is too reasonable and logical, not to command the assent of every under‑ standing. In the case of *Jerrard* v. *Saunders*, (2 *Vezey*, jun. 454.) the defendant pleaded a purchase for a valuable consideration without notice; but as the plea did not deny the facts charged, from which notice was to be inferred, the plea was overruled, and he was called upon to answer the facts, which might raise a constructive notice; and lord *Loughborough*, in that case, required, that the purchaser should fully, and in the most precise terms, deny every circumstance, from whence notice could be inferred. If, then, the appellants knew, at the time of taking their judg‑ ment, that *Wardell* had assigned his judgment, and that he was but a nominal party to the record, they acted at their peril; and they were bound to have inquired of the *cestuy que*

ALBANY,
Feb. 1806.

Bebee & others
v.
The Bank of
New-York.

*trust*, whether he was knowing and consenting to that satisfaction. If they did not choose to make that inquiry, but were willing to rely upon the declarations of *Wardell* and *Eden*, they ought justly to bear the consequences of their supineness. We are not to help a party in setting out his title. It is incumbent on him to state a valid pretension. The appellants ask us to help a title, which they challenge as superior, by reason of *Wardell's* fraud ; but to raise any equity in their favour, they ought, at least, to purge themselves of any knowledge of that fraud. It would be a proceeding contrary to all rule and salutary precedent, for us to presume that the appellants acted without knowledge of *Wardell's* assignment, when they do not pretend to deny it in their bill, and when the truth of the allegation, that they had or had not notice, remained in their own breasts. This is, probably, the first instance ever heard of, that a person claiming to be a purchaser, without notice, came into a court of equity, *in the character of plaintiff ;* and the reason that there has been no such case, is the one already mentioned, that where the equity of the parties is equal, chancery will not interfere. I do not ask the appellants to do, what they cannot do, prove a negative. They cannot prove no notice. But they can tell us by their bill in what character they claim relief. If they claim it as purchasers, without notice, let them say so ; then they raise some equity on the face of their bill, and it would lay with the respondents to rebut it, and to prove affirmatively that they had notice. My proposition has, at least, the merit of plainness and simplicity. It is, that the court will never presume that a party's case is better than he states it ; and if he does not state that he is a purchaser, without notice, we will not presume him to be one.

But the bill furnishes still more positive and conclusive proof on the subject. The appellants state, as their grievance, that the bank had levied an execution against *Eden*, when nothing was due from *Eden* thereon, and that thereby the appellants were deprived of their security. They then called upon the bank, to discover, whether *Eden* had not fully paid the judgment to *Wardell*, and they pray, " *that the judgment*

Vol. I.          4 E

*of the bank may be decreed to stand as a security for such sum only as may appear to be really and truly due thereon by Eden.*" The bill, therefore, contains a very explicit acknowledgment, that the judgment of the bank ought to have preference for the balance honestly and truly due thereon ; and to give the appellants a priority in their judgment, is to force upon them a right which they do not ask for, or pretend to. And although, under the general prayer in a bill for relief, you may give a party greater, or different relief than that specifically prayed for ; yet, when such specific relief necessarily implies the non-existence, or relinquishment of a claim, it would be altogether unprecedented to depart from the special relief, and under the general words of form in the bill, to enforce such claim.

I conclude, therefore, 1st. That if the appellants were *bona fide* judgment creditors, without notice of *Wardell's* assignment, they would have no more equity than the respondents ; and this court would not interfere with their claims at law. 2d. That the appellants are not to be deemed such creditors, because, they do not state themselves to be such in their bill, and because, the whole complaint and prayer in the bill are founded on the non-existence, or relinquishment of such claim. The parties stand exactly as they would have stood, if *Wardell* had never made his fraudulent acknowledgment of satisfaction, and the appellants, as subsequent judgment creditors, have an undoubted right to establish, by proof, the payment of the first judgment. If *Eden* paid *Wardell* before notice of the assignment, the payment was valid, and his estate ought not to be charged with a second payment. The real merits of the cause will, therefore, turn upon this single point, what payments, and to what extent, were made by *Eden* to *Wardell*, previous to notice. But before we come to consider this part of the cause, it will be requisite to take notice of another objection which has been raised by the appellants' counsel to any claim on the bank, as derived from the assignment.

It is urged, that the assignment of the judgment of *Olcott* was not absolute, but was made and intended to be merely

as a collateral security for a special purpose, which purpose was afterwards accomplished ; that the consideration for that assignment was only $25,500, and that shortly after, Olcott received of *Wardell* three promissory notes for that purpose, which he transferred to different persons, and that they have since been paid ; that by the payment of the notes, the right of *Olcott* to hold the judgment became extinguished, and the interest in the judgment reverted back to *Wardell* ; that *Olcott* could not transfer any greater interest in the judgment than what he himself held, and that every assignee of a *chose in action*, takes it, subject to all equity ; and that, for these reasons, the bank has no interest in the judgment, all the interest which remained in it having reverted to *Wardell*.

This is the substance of the argument on the part of the appellants, and, to my apprehension, it is easy to perceive and detect its fallacy.

In the first place, it is to be observed, that the assignment of the judgment is, upon the face of it, absolute, and not conditional. It is by a long and solemn instrument under seal, drawn with technical skill, declaring the consideration to be $50,000, and fortified with every provision and covenant, which are requisite to show that *Wardell* parted absolutely with all his interest in the judgment, and that he had received a full consideration. Proof that the assignment was intended by the parties, to be different from what is expressed, is altogether inadmissible. It is a sound rule of evidence, that you cannot alter, or substantially vary, the effect of a written contract by parol proof. This excellent rule is intended to guard against fraud and perjuries, and it cannot be too steadily supported by courts of justice. *Expressum facit cessare tacitum ;—vox emissa volat ;—litera scripta manet*, are law axioms in support of the rule ; and law axioms are nothing more than the conclusions of common sense, which have been formed and approved by the wisdom of ages. This rule prevails equally in a court of equity and a court of law ; for, generally speaking, the rules of evidence are the same in both courts. If the words of a

ALBANY,
Feb. 1806.

Bebee & others
v.
The Bank of
New-York.

contract be intelligible, says Lord Ch. *Thurlow, (Shelburne*
v. *Inchiquin,* 1 *Bro.* 341.) there is no instance where parol
proof has been admitted to give them a different sense.
Where a deed is in writing, he observes, in another place,
(*Jonham* v. *Child,* 1 *Bro.* 93.) it will admit of no contract
which is not part of the deed. You can introduce nothing on
parol proof that adds to, or deducts from, the writing. If,
however, an agreement is, by *fraud or mistake,* made to speak
a different language from what was intended, then, in those
cases, parol proof is admissible, to show the fraud or mis-
take. These are cases excepted from the general rule. But
the allegation of fraud, or mistake, must be made in the bill,
before evidence to those points, can be received. *(Cripps* v.
*Jee,* 4 *Bro.* 472.) In the present case, there is no allegation
or pretence, that the assignment was made absolute, by
means of fraud or mistake ; and on no other ground was pa-
rol proof admissible, to alter it. If it were to be admit-
ted that the assignment might be varied by parol proof, yet,
the proof offered, in the present case, was not of a compe-
tent nature. The witnesses to this point, are *Olcott* and
*Wardell. Olcott,* the original assignee, admits, in his answer,
that the assignment was given for a collateral security. That
confession, however, is no evidence against the respondents,
who were co-defendants, because they had no opportunity to
cross-examine him. This court so decided two years ago, in
the case of *Grant* v. *The Bank of the United States.* The
testimony of *Wardell,* to this point, was wholly improper ;
for he ought not to be heard in opposition to his own solemn
act and deed. The supreme court, in *July* term, 1803, in
the case of *Winton* v. *Saidler,* did recognise and adopt the
English decision, in *Walton* v. *Shelly,** that no man should be
permitted, even as a witness, to invalidate a negotiable paper
which he had signed. The case there arose on a promissory
note, but, from the reasoning of some of the judges, I under-
stand them as adopting the general principle of the English
case, that no person was a competent witness to impeach a
deed, or security, which he had given, and that he was estop-
ped, as well in the character of witness as that of party, by

* 1 *Term,* 296.

his own act and deed. This rule, that a written contract shall not be contradicted by parol proof, without showing an original fraud or mistake, at the time, applies as well where the contract is introduced in a controversy between third persons, as where the litigation is between the original parties to the contract. It was so understood by the court of K. B. in the case of *The King* v. *the Inhabitants of Laindon.* (8 *Term.* 379.) It is reasonable that this should be the case, in order to protect the rights of strangers, who may have become interested in the contract, and to prevent fraudulent collusions between the original contracting parties, in setting up secret meanings, to impair or destroy their own solemn engagements. It appears to me, therefore, that we must consider the assignment from *Wardell* to *Olcott* as an absolute, unconditional assignment, and that we are bound to judge of the nature of the assignment, from the instrument itself, and not from the suggestions of *Olcott*, in his answer, or of *Wardell*, in his deposition.

But, even admitting that the operation of the assignment was impeachable, and that the witnesses offered, for that purpose, were competent, and made out the fact, that *Olcott* took the assignment, as a collateral security merely, and for a much less consideration than it states, still there remains another objection to surmount, and that is, that in the hands of a subsequent assignee, without notice of any private agreement, *dehors* the instrument, the assignment must be regarded, what it purports to be, absolute and unconditional. This is a rule of a court of equity, perfectly well settled. When it is said that an assignee of a *chose in action* takes it, subject to all equity, it is meant only, that the original debtor can make the same defence against the assignee, that he could against the assignor ; the rule has never received any other application. A purchaser without notice, from a purchaser with notice of a trust, is not considered in equity, as bound by that trust. (2 *Vern.* 384. 2 *Fonb.* 153.) If one affected with notice, says Lord Ch. *Hardwicke*, in

the case of *Mertins* v. *Jolliffe*, (*Amb.* 313.) conveys to one without notice, the assignee, in case he has the legal es- tate, shall protect himself against prior incumbrances. In the present case, the bill does not charge the bank with any notice of a conditional assignment, and if it did, the answer of the bank denies any ; for they declare, that the original assignment to *Olcott*, was for the full considera- tion of $50,000, expressed in the deed, and that they were wholly ignorant, that it was made for any other con- sideration, or for any other particular purpose. They further state, that the assignment from *Roe* to them, was for the like consideration. Indeed, it is not suggested, in any pleading, proof, or argument in the cause, that the bank took the assignment from *Roe*, with any knowledge' of the parol agreement between *Wardell* and *Olcott*, and the chief objection to *Olcott's* testimony, is on the ground that he did not disclose to *Roe* the private understanding between him and *Wardell*. In every view, therefore, in which the subject presents itself, the state of the accounts between *Wardell* and *Olcott*, and the secret conditions, which they attached to the assignment, are perfectly irre- levant to the present controversy. Those accounts and agreements must be left to be settled between *Wardell* and *Olcott*. They ought not to obtrude themselves upon our present attention.

I have thus faithfully endeavoured to clear this cause of all the preliminary difficulties which have been thrown in its way by the ingenuity of counsel ; and though I al- ways feel a well-grounded diffidence in my own judgment, when I am not supported by my brethren ; yet the posi- tions I have taken appear to my mind to be so hemmed in by authority, that, step which way we will, we cannot es- cape from their conclusions, without trampling upon pre- cedents which we ought, perhaps, to revere.

I shall very briefly examine the remaining questions in the cause.

The real question is that which I have already stated, viz. to what extent has the judgment which the bank possess, been legally paid? Upon this question there is contradictory proof in the case, and it was for the information of the court below upon this matter of fact that the issue was awarded. The chancellor had an undoubted right to have decided this question upon the proofs before him, without calling in the aid of a jury. But where the question is doubtful, and especially where it turns upon the credit of opposite witnesses, it is the usual and prudent course of the court to refer it to a jury, which is the common law tribunal for the trial of facts. The payment of this judgment, if made at all, was made to *Wardell*; for it is agreed that no payments were made to any of the assignees of the judgment; and it is a principle equally agreed to, that all payments made to *Eden* by *Wardell* before *Eden* had notice of the assignment, were valid, and that all payments by *Eden*, after notice, were made by him in his own wrong, and are not available against the assignees. The question then is, when was notice of the assignment given to *Eden?* On the one hand, *Eden* testifies that he had no notice till the 9th of October, and on the other hand, *Olcott* says, he gave notice to *Eden* shortly after the assignment; which was made on the 17th of *July.* This testimony of *Olcott* is objected to, but as against the appellants, who called for that answer, it may be read in chancery; it is certainly not more objectionable than the testimony of *Eden*, who had never duly released his interest in the surplus of his estate. But, putting *Olcott's* answer entirely out of view, there was the testimony of *Wilkins*, who seems to be admitted as a disinterested, and very credible witness, and he swears, that *Eden* confessed to him that he knew of the assignment, at the time it was made. Thus stood the testimony before the chancellor, and if the balance of it does not incline in favour of the bank, it must at least, be deemed to be doubtful, and to form a proper case for a jury. It was, therefore,

ALBANY,
Feb. 1806.

Bebee & others
v.
The Bank of
New-York.

ALBANY,
Feb. 1806.

Bebee & others
v.
The Bank of
New-York.

the exercise of a sound discretion, in the court below, to award an issue.

The issue was tried, and the jury found that *Eden* did not recieve notice till the 9th of *October*, and the judge certifies, in the usual form, that he was satisfied with the verdict. This verdict, would then, probably, have been acquiesced in, and have put an end to the cause, if the judge, upon the trial, had not excluded *Olcott*, who was a witness, on the part of the bank. On this ground, a new trial was moved for, and granted. The cause is, then, at last, narrowed down to this single point, was *Olcott* a competent witness? If he was, it will scarcely be pretended but that a new trial was proper ; for a verdict, founded upon the exclusion of legal testimony, never can give satisfaction to the conscience of any court. It is impossible for us to say, what weight the jury might have given to the testimony of *Olcott*, and whether a critical attention to it, might not have turned the scale. The case of *Stace* v. *Mabbott*, (2 *Vezey*, 553.) is in point. Lord *Ch. Hardwicke* granted a new trial, and observed, " that the judge has declared he is well satisfied with the verdict, and, if nothing appeared to me but what appeared to him thereon, I think I should have been of the same opinion. My opinion, therefore, in granting a new trial, is grounded upon new evidence, which was not before the jury, and which is material."

The objections to the competency of *Olcott*, are, 1. That his name stood as defendant in chancery. 2. That he had been guilty of fraud in assigning to *Roe*, absolutely, a judgment, which he took only as a collateral security, and that he might, in consequence thereof, be liable to costs in the suit in chancery. The reason assigned by the chancellor, against the first objection, appears to me to be very forcible. He considered it as an objection to a point of form merely, and that to conclude the party by it, would be rigid. If a co-defendant disclaim, or have no interest in the event of the cause, he may, by an order of the court

of chancery, be examined as a witness, though his name be not struck out of the bill. (2 *Ch. Ca.* 214.) It is a motion of course, says lord *Hardwicke*, (*Man* v. *Ward*, 2 *Atk.* 228.) to examine such a defendant. In another case, ( *Vern.* 230.) it is said, that a co-party, who has no interest, or disclaims it, is a good witness, and it makes no mention about the order. I believe, however, it is the practice of the court, to make such an order, and yet, as it is a matter of form, and granted of course, it would be most unreasonable to deprive a party, forever, of the benefit of testimony, from so trifling an inattention. I am yet to believe, that the judge might not even have dispensed with the order, and, I am sure, that the appellants ought not to receive the countenance of this court, in availing themselves of so frivolous an objection.

The second objection is of a more plausible kind, but, I think, equally destitute of any solid foundation. It is said, that *Olcott* may possibly be made chargeable with costs, for his fraud, and that, therefore, he has an interest in the cause. If this position be granted, it will not disqualify him; for, notwithstanding the strictness of some old cases, the rule is now well settled, that it must be a present, vested, or certain interest, and not a remote, possible, or contingent interest, that will disqualify a witness. (*Peake Ev.* 93. 1 *Term*, 163.) On this ground, it has been held, (4 *Term*, 1'.) that a parishioner, who was liable to be rated in the poor rate, but was not, in fact, rated at the time, was a competent witness, to prove the rateability of others. Of late, the inclination of the courts, has been, to confine the question of interest within strict and precise boundaries, and, to let objections go more to the credit, than to the competency of witnesses. The case cited by the appellants, was that of *Barret* v. *Gore* and *Umfreville*, (4 *Atk.* 401.) where the court is made to say, that, if one defendant, who is offered as a witness, for another, may, by possibility only,

Vol. I.          4 F

ALBANY,
Feb. 1806.

Bebee & others
v.
The Bank of
New-York.

be liable for costs, he shall be excluded. But this is directly contrary to the more recent and rational principle which I have mentioned ; and it is impossible, that it can be correct, to the extent there laid down. It can be shown, by several cases, that unless there can be a decree against a party, he cannot be made liable for costs. In *Piddock* v. *Brown*, (3 *P. Wms.* 288.) which was a bill to impeach some bonds, as obtained by fraud, one of the co-defendants was offered as a witness, and was objected to, on the ground, that though there could be no decree against him, yet, his answer being falsified in many parts, he might be liable for perjury, but lord *Ch. Talbot* laid down this general rule, that if a plaintiff has no equity, or, in other words, no ground for a decree against a defendant, he is a good witness ; else it would be in the power of a plaintiff, to take off all the defendant's witnesses, by naming them as defendants in the action. Again, in the case of *Cotton* v. *Luttrell* (1 *Atk.* 451. 2 *Vezey*, 223.) the bill was filed against *Luttrell* and lady *Cheshire*, to be relieved against a settlement, said to be obtained by fraud, and also to have a conveyance and account of profits, and lady *Cheshire* was equally charged with the fraud. But her deposition was allowed to be read, and the chancellor said, that it was necessary to make her a defendant, for the purpose of discovery ; but she could not be brought to a hearing, as she was no ways concerned in interest, in the event of the suit, and, consequently, no decree could be made against her. And if there be no decree against her, he observes, how is it possible that costs could be given against her. The charge of fraud against her, went, therefore, only to her credit, and not to her competency. It would be difficult to find a case more applicable to the present, or, where the reasoning is more conclusive. In *Barrett* v. *Gore*, the bill stated a breach of trust in one defendant, and prayed a specific performance against the other, and it appeared, that the defendant, who was offered as a witness for the other,

had grossly misbehaved in the trust, and a decree might, perhaps, be had against him, by compelling him to reassume his trust. But, let that solitary and loosely reported case read as it may, it appears, that subsequent to all these cases, (2 Vezey, 284.) the decision in *Cotton* v. *Luttrell*, was quoted and confirmed, and the court held, that where nothing could be prayed against a co-defendant, he should be dismissed without costs, for, that a person should not be brought before the court, merely to pray costs against him. I think I have, therefore, abundantly proved, that as *Olcott* had no concern or interest, in the present cause; that, as he was not brought to a hearing, and no decree was prayed, or could be had against him, he was not liable to be amerced in costs, and was, consequently, a competent witness for the bank, and ought to have been received at the trial.

There was an objection, also, made to the form of the order for a new trial, that it did not state, that the chancellor had decided, that *Olcott* was to be deemed a competent witness, notwithstanding both objections. This is a criticism almost too idle to deserve notice, and has no foundation, in fact. The order does state, that *Olcott* shall be admitted to be sworn, as a witness, *notwith-standing his being a party in the cause*, which reaches equally to both objections, for both arise from his being a party.

I am, accordingly, upon the whole view of the case, of opinion, that the interlocutory order below ought to be affirmed, and the cause remanded.

Woodworth, Attorney-general. I concur in the opinions which have been delivered, for reversing the order, and that judgment be given in favour of the appellants.

Nicholas, senator. I concur in the opinion delivered by his honour the Chief Justice.

The majority of the court having declared their opinions in favour of a reversal ; it was thereupon ORDERED, DECREED and ADJUDGED, that the order and decree con-

plained of, be reversed ; and that the appellants are enti-
tled to receive the nett proceeds, of the sale of *Joseph
Eden's* estate, on the *fieri ficias*, in favour of *John War-
dell*, against *Joseph Eden*, and the costs in the court of
chancery ; and that the proceedings be remitted to that
court, to be carried into execution, with directions also,
to the chancellor to decide, whether, under the facts and
circumstances of the case, the appellants are entitled to
interest, on the sum above decreed to the appellants.

Judgment of reversal.